JAURIGUE LAW GROUP
Michael J. Jaurigue (SBN 208123)
  michael@jlglawyers.com
Abigail A. Zelenski (SBN 228610)
  abigail@jlglawyers.com
David Zelenski (SBN 231768)
  david@jlglawyers.com
114 North Brand Boulevard, Suite 200
Glendale, California 91203
Telephone:  (818) 630-7280
Facsimile:  (888) 879-1697

GLANCY PRONGAY & MURRAY LLP
Lionel Z. Glancy (SBN 134180)
  lglancy@glancylaw.com
Marc L. Godino (SBN 182689)
  mgodino@glancylaw.com
Mark S. Greenstone (SBN 199606)
  mgreenstone@glancylaw.com
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160

*Attorneys for Plaintiffs*
*SUNIL DANIEL and ERNEST BANAAG*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUNIL DANIEL and ERNEST BANAAG, individually and on behalf of all others similarly situated,<br><br>                Plaintiffs,<br><br>        v.<br><br>FIVE STARS LOYALTY, INC., a Delaware corporation; and DOES 1 through 50, inclusive,<br><br>               Defendants. | Case No. 15-CV-03546-WHO<br><br>**SECOND AMENDED CLASS-ACTION COMPLAINT**<br><br>Violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227<br><br>**DEMAND FOR JURY TRIAL** |

**INTRODUCTION**

1.      Pursuant to rule 23 of the Federal Rules of Civil Procedure, Plaintiff Ernest Banaag ("Plaintiff") brings this class action on behalf of himself and all others similarly situated against Five Stars Loyalty, Inc., a Delaware corporation ("Defendant" or "Five Stars"); and Does 1 through 50, inclusive.[1]

2.      As alleged below, Defendant has violated the Telephone Consumer Protection Act (the "TCPA"), 47 U.S.C. § 227, through its unwanted cellular-telephone contact of consumers.  Specifically, Defendant has violated the TCPA by sending unsolicited text messages for marketing purposes that advertise products and/or services to unconsenting consumers, invading their right to privacy.

3.      Pursuant to 47 U.S.C. § 227(b)(3), Plaintiff and Class Members are entitled to, *inter alia*, statutory damages and injunctive relief for Defendant's violations.

**JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT**

4.      ***Jurisdiction***.   Sunil Daniel initiated this action in the Superior Court of the State of California for the County of San Francisco on June 23, 2015.  Thereafter, on approximately July 31, 2015, Defendant removed the action to the above-captioned Court pursuant to 28 U.S.C. §§ 1331, 1441, and 1446 on the ground that, *inter alia*, the action arises under a law of the United States.  Federal and state courts have concurrent jurisdiction over suits arising under the TCPA.  See Mims v. Arrow Fin. Servs., LLC, 132 S. Ct. 740, 745 (2012).  This Court therefore has subject-matter jurisdiction of Plaintiff's claim for relief.  Furthermore, this Court has personal jurisdiction over Defendant because, as alleged below, Defendant has had systematic and continuous contacts within the County of San Francisco, State of California.

5.      ***Venue***.  As alleged more particularly below, venue is proper in the United States District Court for the Northern District of California because Defendant's principal place of business is located within the County of San Francisco, which County is located in the Northern District.  Defendant therefore resides in in this District, and a substantial portion of the events, omissions, and/or injuries giving rise to Plaintiff's claim for relief against Defendant emanated from within this District.

---

[1] As set forth below, this action was originally filed by Sunil Daniel.  Mr. Daniel's First Amended Complaint was dismissed with leave to amend on November 24, 2015.

6.     **_Intradistrict Assignment._**   Following removal, on August 12, 2015, this action was assigned to the San Francisco division for all further proceedings.

**PARTIES**

7.     Plaintiff is, and at all times relevant to this action was, a California resident of the County of Los Angeles.  He is, and at all times relevant to this action was, a "person" as defined under 47 U.S.C. § 153.

8.     Plaintiff is informed and believes, and based thereon alleges, that Five Stars is a corporation with its principal place of business at 321 11th Street, San Francisco, California 94103. Plaintiff is further informed and believes, and based thereon alleges, that Five Stars is authorized to conduct business, and does conduct business, throughout the State of California and the United States. In addition, Plaintiff is informed and believes, and based thereon alleges, that Five Stars is, and at all times relevant to this action was, a "corporation" and a "person" as defined under 47 U.S.C. § 153.

9.     Plaintiff is informed and believes, and based thereon alleges, that each and all of the acts and omissions alleged herein were performed by, or are attributable to, Five Stars and/or Does 1 through 50 (collectively "Defendants"), each acting as the agent for the other, with legal authority to act on the other's behalf.  The acts of any and all Defendants were in accordance with, and represent, the official practice and policy of Defendants.  Plaintiff is unaware of the true names or capacities of the Defendants sued herein under the fictitious names Does 1 through 50, but will seek leave of this Court to amend this Complaint and serve such fictitiously named Defendants once their names and capacities become known.

10.     Plaintiff is informed and believes, and based thereon alleges, that Does 1 through 50 were the partners, agents, owners, shareholders, managers, co-conspirators, or employees of Five Stars at all relevant times.

11.     Plaintiff is informed and believes, and based thereon alleges, that each of said Defendants is in some manner intentionally, negligently, or otherwise responsible for the acts, omissions, occurrences, and transactions of each and all of the other Defendants in proximately causing the damages herein alleged.

12.     Plaintiff is informed and believes, and based thereon alleges, that Defendants, and each of

3

1  them, ratified each and every act or omission complained of herein.  At all relevant times, Defendants,

2  and each of them, aided and abetted the acts and omissions alleged herein.

3  **ALLEGATIONS CONCERNING FIVE STARS**

4  13.   Five Stars is a customer-rewards program that merges with merchant point-of-sale

5  ("POS") terminals to give consumers "loyalty" discounts, including reward points, that can be used

6  toward the purchase of products and services offered by the merchants.  Five Stars—which claims to be

7  the most widely used customer-loyalty network for small and medium businesses in North America, and

8  to have grown from "two guys in a garage to serving thousands of businesses across the country," Five

9  Stars, http://www.Five Stars.com/team/ (last visited Sept. 8, 2015)—helps participating merchants

10  develop "customized loyalty program[s]," as set forth in its "Ultimate Guide to Customer Loyalty and

11  Success (the "Ultimate Guide").  A fundamental principle underlying Five Stars is that fostering repeat

12  business is more profitable over the long term than replacing existing customers with new ones.  Five

13  Stars uses loyalty discounts to do this—customers are offered points or other discounts to encourage

14  them to return and make additional purchases.

15  14.   A key element of Five Stars' business model is text-message marketing.  In a July 15,

16  2014, blog posting titled "95 out of 100 Customers Open Your Text Promo Within 3 Minutes," Five

17  Stars' Content Marketing Strategist Angela Prilliman explains why the company views text messaging

18  as critical and outlines the steps for making text-message campaigns more effective.  Ms. Prilliman

19  writes:

20  You've heard us say it many times before, and we will continue to preach it:  if
21  you aren't texting your customers, YOU SHOULD BE!

22  And WHY should you be text messaging your customers?

23  - **95 out of 100 of your customers who have opted into your text
   messaging program OPEN and READ your mobile messages
24  within 3 minutes. –** Forbes Online

25  - Mobile text messaging, the same 160-character dispatches first
   popularized by nimble-fingered teenagers, may be the closest thing in
26  the information-overloaded digital marketing world to a guaranteed
   read. – NY Times

27  - 90% of consumers who have joined mobile loyalty programs feel they
   have gained value from them. – Zoomerang

28

- **On average, it takes 90 minutes for someone to respond to an email, but of course some people might take hours or days to even look at it.  With text messages, the average response time is 90 seconds.** – Hubspot

- Around 98% of all SMS messages are opened, but only 20% of emails are looked at. – Digital Marketing Magazine

- **Mobile coupons get 10 times the redemption rate of traditional coupons.** – Hubspot

- 91% of all U.S. citizens have their mobile device within reach 24/7. – Morgan Stanley

- Nearly two-thirds of consumers subscribed to mobile marketing indicate that they have made a purchase as a result of receiving a highly relevant mobile message. – Responsys

Long story short, your promotions actually get read by your customers on the spot and they drive customers in your store faster than any other marketing medium out there.

Angela Prilliman, 95 out of 100 Customers Open Your Text Promos Within 3 Minutes, Five Stars (July 15, 2014, 7:00 a.m.), http://blog.Five Stars.com/customers-open-text-messages/ (emphasis in original).

15.     Similarly, in the "Ultimate Guide," Five Stars includes several pages on using text-message campaigns to drive customer loyalty.  This presentation illustrates, among other things, Five Stars' keen awareness of the laws governing text messaging.   In the Ultimate Guide, Five Stars admonishes, "Some rules are meant to be broken . . . but laws are not."  (ellipsis in original)  Five Stars goes on to provide a link to the TCPA and advises that "the customer has to give written consent to receive texts, and you must have [an] opt out option in [the] message."

16.     Five Stars equips participating merchants with scanners and plastic cards that, on information and belief, are integrated with the merchants' POS systems.  Consumers are encouraged to provide their telephone numbers to the merchant, who enters the numbers into the system and swipes the Five Stars card over the scanner to track purchases.  Five Stars then begins to use the power of text messaging combined with the offer of loyalty discounts (including, as noted above, reward points) to induce repeat business.  The Ultimate Guide sums this up aptly, explaining, "Customer[s] give[] you their phone number to start earning rewards" and "Five Stars uses that info to encourage customers to return."

17.     At no point in this process designed by Five Stars, however, is the consumer presented with any agreement to execute concerning the receipt of text messages or any other matter, in paper or

1  electronic format.  On information and belief, such an agreement could easily be provided but is not in

2  order to maximize the reach of the Five Stars program.

3      18.    The Flame Broiler, a fast-food restaurant chain, is one of many businesses that utilizes

4  Five Stars.

5              **ALLEGATIONS CONCERNING PLAINTIFF'S EXPERIENCE**

6      19.    On or around April 8, 2015, Plaintiff visited a Flame Broiler restaurant in California.  The

7  Flame Broiler cashier informed Plaintiff that, through Five Stars, customers can earn loyalty discounts

8  toward future purchases.   The cashier then asked for Plaintiff's telephone number, which Plaintiff

9  provided orally.  At no time did Plaintiff provide any written consent, whether in paper or electronic

10 format, to receive loyalty-program text messages from Five Stars.

11     20.    After providing his number, Plaintiff received the following text messages, on or around

12 the following dates, from Five Stars on his cellular telephone (telephone number (323) XXX–0215):

| *Date* | *Text Message* |
| --- | --- |
| May 11, 2015 | Flame Boiler: $1 off any purchase of a regular bowl/plate and drink combo. Thank you for your business!. Reply YES to claim. Exp May 31 txt OFF to Unsubscribe |
| May 25, 2015 | Flame Boiler: Not grilling today? Come enjoy any two reg bowls and two mini bowls for $19.99. Reply YES to claim. Exp May 25 txt OFF to unsubscribe |

25 /////

| | |
|---|---|
| June 8, 2015 | Flame Broiler: Special thank you for our regulars. Thanks for your business. $1 off your next purchase. Reply YES to claim. Exp June 30 txt OFF to Unsubscribe |
| July 14, 2015 | The Flame Broiler: Free mini bowl w/ purchase of $5 or more Here is a reason to come back and visit us.  Receive a free mini bowl with any purchase of $5 or more. Reply YES to claim. Exp 7/31. Reply OFF to stop. |
| August 6, 2015 | The Flame Broiler: Free Reg Drink w/ Any Purchase August promotion for our customers. Receive one reg size drink with any purchase. Reply YES to claim. Exp 8/31. Reply OFF to stop. |
| September 16, 2015 | The Flame Broiler Pasadena: Free mini bowl w/ purchase of $5 or more Here is a reason to come back and visit us.  Receive a free mini bowl with any purchase of $5 or more. Reply YES to claim. Exp 9/30. Reply OFF to stop. |

/ / / / /

21.    Plaintiff's cellular-telephone number is linked to a subscription plan under which he is charged each month for cellular-telephone and data services.  Each of the above text messages was sent by Five Stars to his cellular telephone from short-code 578-2777.

22.    Again, Plaintiff was not told at the time he provided his telephone number that text messages would be sent to him for any purpose.

23.    As is apparent from the content of the above text messages, they were sent without an emergency purpose; instead, they were sent for the purposes of advertisement or telemarketing to encourage participation in Defendant's rewards program, as well as to encourage purchases from participating merchants.

## ALLEGATIONS CONCERNING AUTODIALING

24.    Plaintiff is informed and believes, and based thereon alleges, that the above text messages were sent by Defendant through its own equipment.

25.    Plaintiff is informed and believes, and based thereon alleges, that his cellular-telephone number was entered into a database and that Defendant used equipment capable of storing and/or producing telephone numbers, as well as capable of dialing such numbers, to send the above text messages to Plaintiff.  That such equipment was utilized is evidenced by the fact that the text messages were sent to Plaintiff from a short-code without any specific reference to Plaintiff's name.  It also is evidenced by the fact that, according to Five Stars' website, 325,000 new consumers are enrolled into the Five Stars program every month—"[m]ore members than any other rewards program"—whom Five Stars keeps track of by telephone number.  Five Stars, http://www.fivestars.com/businesses/ (last visited Sept. 9, 2015).  It therefore would be practically infeasible to send text messages to all of these numbers manually; instead, Five Stars' system must be capable of sending large volumes of text messages automatically to numbers stored in the system's database or in a database accessed by the system.

26.    In addition, the Ultimate Guide explains that Five Stars' text-messaging system has an "AutoPilot" feature enabling it to "sync [merchants'] text marketing with actual behavior—automatically" so that "[merchants] never have to worry about planning out text schedules," *i.e.*, Five Stars "handle[s] it all for [the merchants]" by automatically sending messages to consumers, *e.g.*, on the consumers' birthdays, after the consumers visit a participating merchant, or after a certain number of

days has elapsed since a consumer's last visit to a merchant.  Accord Five Stars, http://go.fivestars. com/autopilot (explaining that, through the AutoPilot feature, Fives Stars "run[s] your marketing & promotions automatically" by, for example, "tak[ing] care of your customer engagement needs with automated campaigns, including incentives to bring back lapsed customers and special rewards on birthdays," and characterizing the AutoPilot feature as "smart marketing without lifting a finger") (last visited Dec. 15, 2015).  In other words, the system can be programmed to send messages automatically when certain triggering events occur.  Moreover, according to the Ultimate Guide, Five Stars "deliver[s] real results [that participating merchants] can see" by tracking statistics for the merchants' marketing campaigns through a website feature called the "Online Five Stars Dashboard," further supporting the notion that Five Stars utilized computerized equipment capable of dialing numbers automatically when sending text messages.  Accord, Five Stars, http://go.fivestars.com/autopilot ("Phone numbers, emails, birthdays, we help you collect all of these through AutoPilot," and "We deliver you the results in an easy to understand format" through "weekly updates with the numbers of emails collected, birthdays collected, and customer redemptions of your promotions") (last visited Dec. 15, 2015).

27.    Plaintiff is informed and believes, and based thereon alleges, that Defendant sent the above text messages, as well as thousands of similar text messages, *en masse* to the cellular telephones of members of the general public using the equipment described in paragraphs 25 and 26, *supra*. Plaintiff is further informed and believes, and based thereon alleges, that those text messages were sent even though Defendant had never obtained signed authorizations expressly permitting advertising or telemarketing messages from any of the individuals to whom the messages were sent.

## CLASS-ACTION ALLEGATIONS

28.    Plaintiff seeks to represent the following Class under rule 23 of the Federal Rules of Civil Procedure:  All persons throughout the United States who, since October 16, 2013, received one or more text messages transmitted by Five Stars on their cellular telephones, and made for a marketing or advertising purpose.

29.    Plaintiff reserves the right to amend or modify the proposed Class, or to propose subclasses or limitations to particular issues, in response to facts later ascertained.

30.    ***Numerosity***.  The identities of Class Members may be ascertained from Defendant's own

business and marketing records, as well as the records of Defendant's telephone provider(s). Joinder of all Class Members would be impracticable due to the sizeable number of such Members and their likely lack of resources to initiate individual claims. Plaintiff estimates that thousands of text messages were sent to well-over the forty individuals required for numerosity purposes. Also, as explained below, the amount that is owed to any given Class Member under the TCPA is relatively small, making it impractical for them to bring their own individual suits.

31.   ***Commonality***.   There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual Class Members. These common questions include, without limitation:

a)   Whether the text messages constitute telemarketing or advertising within the meaning of the TCPA and its regulations;

b)   Whether the equipment used to send the text messages constitutes an automatic telephone dialing system within the meaning of the TCPA and its regulations;

c)   Whether prior express written consent was required under the TCPA and its regulations before sending any of the text messages; and

d)   Whether the outright failure to secure any prior express written consent constitutes willful and knowing behavior within the meaning of the TCPA and its regulations.

32.   ***Typicality***.   Plaintiff's claims are typical of those of the Class because he received promotional text messages from Defendant on or after October 16, 2013; he never provided prior express written consent to receive the text messages; and the text messages were sent to him using the same equipment used to send text messages to all Class Members on their cellular telephones.

33.   ***Adequacy***.   Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff is not aware of any conflicts with Class Members, and he plans on pursuing the litigation vigorously. Plaintiff also has the same interests as those of the Class, and has retained counsel who are competent and experienced in class-action litigation. In addition, Plaintiff has been actively involved in the litigation, he will continue to participate and be available for the duration of the litigation, and he understand the duties that he holds to the Class.

34.   ***Superiority***.   A class action is superior to other available methods for the fair and

efficient adjudication of this controversy.  Again, the individual joinder of all Class Members is impracticable because of the relatively small recovery amounts at stake and the relative lack of resources available for individual Class Members vis-à-vis the large corporate Defendant.  Additionally, the judicial system would be burdened with multiple trials of the same issues, and the potential for inconsistent or contradictory judgments would increase.  The common questions detailed above, in fact, predominate in this action, as Class Members' claims arise out of the same course of conduct to which Plaintiff was himself subject.  A class action would therefore conserve the resources of the parties and the Court while protecting the rights of Class Members.  Defendant's conduct as described above is unlawful, continuing, capable of repetition, and will continue unless restrained and enjoined by the Court.  Moreover, it is a matter of public interest to obtain definitive answers to the legality of Defendant's actions in a single case.

**FIRST CLAIM FOR RELIEF**

*Violation of the TCPA*

*47 U.S.C. § 227*

35.    Plaintiff re-pleads, re-alleges, and incorporates by reference each and every allegation set forth in this Complaint.

36.    The United States Congress enacted the TCPA in order to protect and balance individual privacy rights against legitimate telemarketing practices.  In enacting this statute, Congress found:

(1) The use of the telephone to market goods and services to the home and other businesses is now pervasive due to the increased use of cost-effective telemarketing techniques.

. . . .

(10) Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy.

(11) Technologies that might allow consumers to avoid receiving such calls are not universally available, are costly, are unlikely to be enforced, or place an inordinate burden on the consumer.

(12) Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion.

1   Telephone Consumer Protection Act of 1991, PL 102–243, December 20, 1991, 105 Stat 2394.

2        37.    The TCPA specifically prohibits automated calls or messages to consumers' cellular-

3   telephone numbers without the express consent or permission of the consumers:

4        It shall be unlawful for any person within the United States, or any person outside the
         United States if the recipient is within the United States (A) to make any call (other than
5        a call made for emergency purposes or made with the prior express consent of the called
         party) using any automatic telephone dialing system or an artificial or prerecorded
6        voice . . . (iii) to any telephone number assigned to a . . . cellular telephone service . . . .

7   47 U.S.C. § 227(b)(1). According to the Ninth Circuit, a text message is a "call" within the meaning of

8   the TCPA. Satterfield v. Simon & Schuster, Inc., 569 F.3d 946, 954 (9th Cir. 2009).

9        38.    Under the relevant regulation, effective October 16, 2013, "prior express consent" as

10  used in subsection (b)(1)(A)(iii) of the TCPA means "prior express *written* consent" for all

11  telemarketing or advertising messages. 47 C.F.R. § 64.1200(a)(2) (emphasis supplied). Such consent

12  must be signed by the consumer, must state that the consumer is agreeing to receive future telemarketing

13  or advertising messages, and must be executed independent of any purchase of goods or services. Id.

14  § 64.1200(f)(8).

15       39.    The foregoing acts and omissions of Defendant constitute a direct violation of the TCPA.

16  Five Stars was and is aware of the TCPA and its requirements and, on information and belief,

17  intentionally violated the law in an effort to maximize the reach of its program. Five Stars' violations

18  therefore were willful.

19       40.    The TCPA establishes a private right of action for sending unauthorized messages to

20  consumers:

21       A person or entity may, if otherwise permitted by the laws or rules of court of a State,
         bring in an appropriate court of that State (A) an action based on a violation of this
22       subsection or the regulations prescribed under this subsection to enjoin such violation,
         (B) an action to recover for actual monetary loss from such a violation, or to receive $500
23       in damages for each such violation, whichever is greater, or (C) both such actions. If the
         court finds that the defendant willfully or knowingly violated this subsection or the
24       regulations prescribed under this subsection, the court may, in its discretion, increase the
         amount of the award to an amount equal to not more than 3 times the amount available
25       under subparagraph (B) of this paragraph.

26  47 U.S.C. § 227(b)(3). Pursuant to 47 U.S.C. § 227(b)(3)(B), Plaintiff and Class Members are entitled

27  to an award of $500 in statutory damages for each and every promotional text message that they

28  received. Moreover, because Five Stars willfully and knowingly violated the TCPA as alleged above,

1    Plaintiff and Class Members are entitled to treble damages.    Finally, pursuant to 47 U.S.C.

2    § 227(b)(3)(A), Plaintiff and Class Members are entitled to injunctive relief.

3                                    **PRAYER FOR RELIEF**

4         **WHEREFORE**, Plaintiff prays for judgment as follows:

5         1.    An order certifying the Class under rule 23 of the Federal Rules of Civil Procedure;

6         2.    That the Court enter judgment in favor of Plaintiff and Class Members for the period of

7    time since October 16, 2013, for statutory treble damages against Defendant, as well as for injunctive

8    relief;

9         3.    An award of pre-judgment and post-judgment interest, to the extent allowable by law;

10        4.    An award of attorney's fees and costs of suit, to the extent allowable by law; and

11        5.    Such further relief as the Court deems fit and proper.

12

13   Dated:  December 18, 2015             GLANCY PRONGAY & MURRAY LLP

14                                         JAURIGUE LAW GROUP

15                                         By:    /s/ David Zelenski
                                           Lionel Z. Glancy
16                                         Marc L. Godino
                                           Mark S. Greenstone
17                                         1925 Century Park East, Suite 2100
                                           Los Angeles, California 90067
18
                                           Michael J. Jaurigue
19                                         Abigail A. Zelenski
                                           David Zelenski
20                                         114 North Brand Boulevard, Suite 200
                                           Glendale, California 91203
21
                                           *Attorneys for Plaintiffs*
22                                         *SUNIL DANIEL and ERNEST BANAAG*

23   / / / / /

24

25

26

27

28

1

**DEMAND FOR JURY TRIAL**

2

Plaintiff requests a trial by jury as to all claims for relief.

3

4    Dated:  December 18, 2015                    GLANCY PRONGAY & MURRAY LLP
                                                 JAURIGUE LAW GROUP
5
                                                 By:  ___/s/ *David Zelenski*_____
6                                                Lionel Z. Glancy
                                                 Marc L. Godino
7                                                Mark S. Greenstone
                                                 1925 Century Park East, Suite 2100
8                                                Los Angeles, California 90067

9                                                Michael J. Jaurigue
                                                 Abigail A. Zelenski
10                                               David Zelenski
                                                 114 North Brand Boulevard, Suite 200
11                                               Glendale, California 91203

12                                               *Attorneys for Plaintiffs*
                                                 *SUNIL DANIEL and ERNEST BANAAG*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SEC. AM. CLASS-ACTION COMPL. – Case No. 14-CV-03546

LA01\LEECA\704613.1